**UNITED STATES of America, Appellee,**

v.

**Albert PUCO, Defendant-Appellant. No. 197, Docket 72-1737.**

United States Court of Appeals, Second Circuit.

Argued Oct. 30, 1972.

Decided Jan. 11, 1973.

Rehearing Denied May 4, 1973.

Jay Goldberg, New York City, for appellant.

John H. Gross, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty. for Southern District of New York, John W. Nields, Jr., Asst. U. S. Atty., on the brief), for appellee.

Before LUMBARD, FEINBERG and OAKES, Circuit Judges.

FEINBERG, Circuit Judge:

Albert Puco was convicted in April 1972 by a jury in the United States District Court for the Southern District of New York, Arnold Bauman, J., of selling narcotic drugs to an undercover federal agent in violation of 26 U.S.C. §§ 4705(a) and 7237(b).[1] Puco was sentenced on May 22, as a second time narcotics law violator, to 14 years in prison. This was Puco's third trial on two counts of conspiracy to sell narcotic drugs and sale of such drugs. At a trial in February 1970, Puco and a co-defendant, Robert Gonzalez, were convicted on each count, but their convictions were reversed because of improper prosecutorial comment. United States v. Puco, 436 F.2d 761 (2d Cir. 1971) (reversal of Gonzalez's conviction, April 16, 1971, is unreported). A superseding indictment was filed the same month, again charging conspiracy and sale of narcotics. At their second trial, in June 1971, both defendants were again found guilty on each count. On appeal Puco's conviction was once more reversed—because of use of a 21-year old conviction in cross-examining him—and his case was remanded, 453 F.2d 539; the conviction of Gonzalez was affirmed. 460 F.2d 1286. At Puco's third trial, he was acquitted of the conspiracy charge but convicted on the sale charge.[2] It is from this conviction that he now appeals. For reasons set forth below, we affirm the conviction.

## I

The events leading to Puco's arrest began when agents of the Bureau of Narcotics and Dangerous Drugs, together with an informer, contacted Gonzalez, a suspected narcotics dealer, to discuss a possible heroin purchase. At their first meeting, in late June 1969, Gonzalez was unable to reach his "connection" by phone. The next day Gonzalez again met with the agents and described his contact as Italian and as having "a legitimate business front." During this meeting Gonzalez placed a call to his contact, known as "Al"; one of the agents sought to arrange a transaction with him, but the negotiations stalled. Four days later, the agents again met with Gonzalez. Once again, the heroin deal foundered, but another of the agents, George Ellin, reached an agreement with Gonzalez for a separate purchase of cocaine, to be supplied by Al.

On July 2, by prearrangement, Ellin met Gonzalez and they drove, at Gonzalez's direction, to White Plains Road in the Bronx. When they were near Wood Avenue and White Plains Road, Gonzalez stated that this was the block where the sale would be made and that his connection owned a store in the area and used a nearby building for drug deliveries. Later they parked across the street from the block in question, and Gonzalez pointed out one building as the place where the delivery would be made at 8:00 o'clock. The two men waited; at 8 P.M. appellant Puco left the TV repair shop that he owned on the block, carrying a "suitcase type of bag." Gonzalez then reportedly said to Ellin, "There's my man now, the individual with the bag. He carries the merchandise in the bag." Puco entered the building that Gonzalez had earlier identified, which was immediately next door to Puco's shop. Gonzalez left the car and followed Puco into the building, emerging "less than a minute" later with a brown paper bag containing one-half kilo of cocaine. On a signal from Ellin, surveilling agents closed in and arrested Gonzalez. Ellin then identified Puco as he came out of the building, still carrying his bag, and Puco was arrested as well. No

---

1. Both provisions were repealed, effective May 1, 1971, by the Comprehensive Drug Abuse Prevention and Control Act § 1101 (b)(3)(A), (4)(A), 84 Stat. 1292. (The equivalent provisions are now found at 21 U.S.C. §§ 828(a), 841(a)(1), (b)(1)

(A).) However, under § 1103(a) of the new Act, the repealed sections are still applicable to "[p]rosecutions for any violation of law occurring prior to the effective date of section 1101 . . . . ."

2. Puco is free on bail pending this appeal.

money had changed hands prior to the arrest.

The most substantial arguments on appeal relate to the remarks Gonzalez allegedly made to Agent Ellin. At trial (Puco's third), Ellin described the events of the day in question, including, over defense objection, the alleged statements of Gonzalez identifying Puco as his connection. As part of the defense case, Puco's counsel sought to introduce into evidence a transcript of Gonzalez's testimony at his—and Puco's—first trial, in which Gonzalez denied that he had seen Puco at all at the time and place in question. The asserted reason for introducing this transcript was to impeach the hearsay declarant, Gonzalez. After ascertaining that the Government was willing to produce Gonzalez, who was then in jail, as a defense witness, Judge Bauman refused to allow introduction of the transcript on the ground "that Mr. Gonzalez is readily available and the best way to hear what Mr. Gonzalez has to say is to produce Mr. Gonzalez." Defense counsel declined to call Gonzalez, principally because to do so might give the prosecution an opportunity to question him about certain statements incriminating Puco that Gonzalez had purportedly made to an Assistant United States Attorney shortly after his arrest.

## II

Appellant's most challenging argument is, in effect, an attack on the constitutionality of the standard exception to the hearsay rule for the extrajudicial declarations of a defendant's alleged co-conspirator. Puco claims that the Government should have been required to call Gonzalez as a witness before allowing Agent Ellin to report Gonzalez's alleged statements and that the failure to do so deprived Puco of his sixth amendment right "to be confronted with the witnesses against him." Ellin's testimony as to what Gonzalez had said, though hearsay, was admitted as reporting statements made in furtherance of a conspiracy. See, e. g., Lutwak v. United States, 344 U.S. 604, 617, 73 S.Ct. 481, 97 L.Ed. 593 (1953).[3] That the testimony was admissible in spite of its hearsay character does not, however, end our inquiry. Although there has not been a consensus in the Supreme Court as to the scope and substance of the Confrontation Clause, the Court has clearly stated that the Clause is not merely a codification of the hearsay rule. See Dutton v. Evans, 400 U.S. 74, 81–82, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (opinion of Stewart, J.), quoting California v. Green, 399 U.S. 149, 155–56, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

Nonetheless, recent Court decisions indicate that the considerations governing the hearsay rule also animate the principles of the confrontation guarantee. Although careful to avoid placing evidentiary rules in a constitutional straitjacket, the Court has emphasized the importance of subjecting evidentiary statements to challenge by cross-examination of the declarant during at least some stage in the judicial proceedings against a defendant. Thus, in California v. Green, *supra*, testimony at a preliminary hearing at which counsel conducted cross-examination was held admissible at trial because of that prior cross-examination, regardless of whether the witness was available at trial, 399 U.S. at 165–66, 90 S.Ct. 1930; and the Court

---

3. The Supreme Court has characterized the co-conspirator rule as a hearsay exception. See Dutton v. Evans, 400 U.S. 74, 80–81, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). However, the question whether the admissibility of admissions (of which the co-conspirator rule is one aspect) is in fact an exception to the hearsay rule has been much debated, compare Morgan, Admissions as an Exception to the Hearsay Rule, 30 Yale L.J. 355 (1921) (exception to hearsay rule), with IV J. Wigmore, Evidence §§ 1048–49 (3d ed. 1940) (use of admissions is consistent with, not exception to, hearsay rule), and the new federal rules of evidence adopt the latter view. Fed.R.Evid. 801(d)(2), 56 F.R.D. 183, 293 (1972) (eff. July 1, 1973, subject to congressional veto).

also held that since the witness was available for cross-examination at trial, the preliminary hearing testimony would have been admissible even if there had been no opportunity to cross-examine. Id. at 157–64. See Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965) (conviction invalid as prosecutor read to jury confession of accomplice, who invoked fifth amendment privilege and thus effectively prevented cross-examination).

The function of the cross-examination requirement is to assure that "the trier of fact has a satisfactory basis for evaluating the truth of the prior statement" introduced into evidence at trial, whether by transcript of a prior hearing or by hearsay testimony. California v. Green, *supra*, 399 U.S. at 161, 90 S.Ct. 1930. However, some statements are, because of their content or the circumstances in which they were uttered, obviously reliable even in the absence of cross-examination of the declarant. Thus, in Dutton v. Evans, *supra*, 400 U.S. at 89, 91 S.Ct. 210, the Court indicated that the presence of sufficient "indicia of reliability" may, in some circumstances, permit the prosecution to introduce out-of-court statements into evidence even though the declarant is available to it and the defendant has never had an opportunity to cross-examine him.[4] Justice Stewart's plurality opinion in *Dutton,* which was joined by three other justices,[5] indicates that the exact scope of this exception to the usual requirement of an opportunity to cross-examine must be worked out on a case-by-case basis, id. at 86, 91 S.Ct. 210, but the exception apparently applies at least where the statement is clearly trustworthy and is not "crucial" to the prosecution or "devastating" to the defendant.[6] See United States v. Adams, 446 F.2d 681 (9th Cir.), cert. denied, 404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 257 (1971); cf. United States v. Clayton, 450 F.2d 16, 19–20 (1st Cir. 1971), cert. denied, 405 U.S. 975, 92 S.Ct. 1200, 31 L.Ed.2d 250 (1972). While the latter standards are fairly general, it should be noted that the prosecution in *Dutton* apparently had a very strong case. Twenty witnesses testified against the defendant, including an eyewitness who identified him as one of the participants in the triple murder, and the plurality opinion characterized the hearsay testimony there in question as "of peripheral significance at most." 400 U.S. at 87, 91 S.Ct. 210. Although the holding in *Dutton* is apparently not sui generis, its scope is uncertain in view of both the facts of the case and other recent decisions. See, e. g., Mancusi v. Stubbs, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972) (transcript of principal witness from first trial admissible at second trial as witness not available and there was adequate cross-examination at first

---

4. The defendant in Dutton v. Evans was tried for participating in the murder of three police officers in Georgia. Among the witnesses called by the prosecution was a prison inmate, who testified that his cellmate, also charged with the murders, had exclaimed, on returning to his cell from the arraignment: "If it hadn't been for that dirty son-of-a-bitch Alex Evans, we wouldn't be in this now." The testimony was admitted under a Georgia statutory hearsay exception, and the Supreme Court, in a 5–4 decision, rejected defendant's claim that he had been denied his constitutional right to confront the declarant, whom the state had never called to testify.

5. The deciding vote was cast by Justice Harlan, who, in a concurring opinion, elaborated a very narrow interpretation of the Confrontation Clause as incorporating only the traditional rule that a defendant be permitted to cross-examine all witnesses testifying against him in court. See 400 U.S. at 94, 91 S.Ct. 210. According to Justice Harlan, the issues discussed in the other opinions were properly questions of due process, and he found the procedures used at trial to be reasonable under that standard.

6. Whether the evidence in question must be "crucial" or "devastating" to escape the *Dutton* holding is not explicitly stated, but Justice Stewart does distinguish the Court's prior decisions on that ground, among others. See 400 U.S. at 87, 91 S.Ct. 210.

trial); California v. Green, *supra*; Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968) (transcript of preliminary hearing testimony inadmissible at trial despite availability of cross-examination at earlier hearing unless Government makes reasonable effort to produce witness at trial); see generally, Davenport, The Confrontation Clause and the Co-Conspirator Exception in Criminal Prosecutions: A Functional Analysis, 85 Harv.L.Rev. 1385 (1972).

■■■ Nonetheless, applying the standards of *Dutton* as we understand them, we conclude that the Confrontation Clause did not bar admission of Agent Ellin's testimony reporting Gonzalez's statements. There is no reason to question the accuracy of Gonzalez's identification of Puco as his source. Gonzalez undoubtedly believed Ellin to be merely an "innocent" purchaser, not a government agent; otherwise Gonzalez would not have been there. Thus, Gonzalez's voluntary disclosure of his source was presumably not tainted by any motive to falsify the identification. Nor is there any reasonable possibility that Gonzalez was in error in his statements since at 8:00 o'clock, the predicted time, Puco appeared and entered the predicted building with a "suitcase type of bag," Gonzalez followed Puco into the building and emerged almost immediately with the agreed-upon cocaine, and was followed shortly by Puco, still carrying his bag. Moreover, Gonzalez's earlier description of his source—as Italian, as answering to the name Al, as owning a legitimate business[7]—is consistent with identification of Puco as the source. In view of all these circumstances, the statements of Gonzalez, if made, were reliable.[8] As for the question whether the reported statements were in fact ever made, no confrontation issue is raised by the use of Ellin's testimony.

As the Supreme Court said with reference to this problem in *Dutton,* 400 U.S. at 88, 91 S.Ct. at 219:

The hearsay rule does not prevent a witness from testifying as to what he has heard; it is rather a restriction on the proof of fact through extrajudicial statements. From the viewpoint of the Confrontation Clause, a witness under oath, subject to cross-examination, and whose demeanor can be observed by the trier of fact, is a reliable informant not only as to what he has seen but also as to what he has heard. [Footnote omitted.]

We also cannot say on these facts that Gonzalez's statement to Ellin was "devastating" or "crucial," although ordinarily a verbal identification of a defendant might well be. Admittedly, these terms do not offer a precise standard, but we interpret them as requiring that the evidence be in some way essential, indeed central, to the prosecution's case. It is true that Ellin's testimony about what Gonzalez had said to him on July 2 was more important than was the hearsay statement quoted in *Dutton.* But even though evidence of Gonzalez's verbal identification of Puco was helpful to the prosecution, it came as part of a sequence of events that made the statement almost unnecessary. Given what had occurred prior to 8:00 P.M. on July 2, even if Gonzalez had said nothing to Ellin when Puco appeared, Gonzalez's immediate departure from the car and entry into the building spoke volumes. A jury could well have convicted Puco based upon prior events and what Ellin had observed of Puco's and Gonzalez's entries into the building and their respective departures from it, Gonzalez with the cocaine.

Finally, on the peculiar facts of this case Gonzalez was "available" to the Government as a witness more in theory

---

**7.** Defendant did not object to this earlier testimony by Ellin.

**8.** We also note that, unlike in *Dutton*, see note 4 supra, there is no ambiguity in Gonzalez's statements. Hence, while

cross-examination might arguably have been helpful to defendant in elucidating a possible non-incriminatory meaning in *Dutton,* see 400 U.S. at 103–104, 91 S.Ct. 210 (Marshall, J., dissenting), such was not the case here.

than in fact. At the second trial of Gonzalez and Puco, Gonzalez took the stand in his own defense. The Government confronted him with a statement made after his arrest admitting that Puco was his source of narcotics; Gonzalez denied making the statement and the trial judge refused to permit the Assistant United States Attorney to whom Gonzalez had allegedly made it to so testify. On the appeal from that second trial, Puco asserted that the denial of his motion for severance had prejudiced him because the Government, in cross-examining Gonzalez, had referred repeatedly to his post-arrest statement that Puco was his source, even though Gonzalez was then unwilling to so testify.[9] Presumably, if the Government had called Gonzalez as a hostile witness in Puco's third trial, the defense would have complained vigorously—and quite possibly successfully—when Gonzalez was again confronted with his statement. See 3A J. Wigmore, Evidence §§ 904, 905 (Chadbourn Rev.1970). Since Gonzalez was not called, the defense had the choice of leaving him out of the trial altogether or calling him as a defense witness with the possibility of impeachment.[10] To this it might be said that the Government, by Ellin's testimony, injected Gonzalez's statements into the case, because Ellin could have told his story without referring to these statements of Gonzalez. But, as already shown, that evidence was clearly admissible, and in large part inferable merely from Ellin's presence at White Plains Road with Gonzalez and the accompanying events and circumstances.

In sum, we regard *Dutton* as requiring a careful case-by-case analysis of the effect of the co-conspirator rule. When Gonzalez identified Puco as "my man," Gonzalez had no motive to falsify. Moreover, his remark was almost unnecessary in view of his immediate action and the events preceding and following it. Finally, the Government was uniquely hampered from putting Gonzalez on the stand. On these facts, application of *Dutton* suggests that no constitutional error was committed.[11]

### III

■ Appellant also objects to the refusal of the court to permit introduction of the earlier testimony of Gonzalez after agent Ellin had quoted him. Citing a number of authorities, e. g., 3A J. Wigmore, supra, § 884; 4 B. Jones, The Law of Evidence § 936, at 1764 (5th ed. 1958), Puco asserts that he is entitled to use the inconsistent statements of a hearsay declarant (Gonzalez) in order to attack his credibility, and that he need not lay a foundation otherwise required for use of such statements, see, e. g., United States v. Hayutin, 398 F.2d 944, 952–953 (2d Cir.), cert. denied, 393 U.S. 961, 89 S.Ct. 400, 21 L.Ed.2d 374 (1968), since the prosecution did not call the declarant. Although we can accept the general validity of appellant's premise, cf. Carver v. United States, 164 U.S. 694, 697–698, 17 S.Ct. 228, 41 L.Ed. 602 (1897), his conclusion that the district court erred in rejecting his claim does not follow. By use of this theory, appellant actually seeks to introduce the evidence of Gonzalez's denials of Ellin's

---

9. As indicated above, this court did not rule on that issue but reversed on another ground.

10. Similarly, in *Dutton*, the out-of-court declarant was available to defendant, who chose not to call him. 400 U.S. at 88 n. 19, 91 S.Ct. 210.

11. We note in passing that since the decision in *Dutton*, four circuits have upheld the constitutionality of the co-conspirator exception in general or at least in circumstances analogous to those found here. See, e. g., United States v. Cerone,

452 F.2d 274, 283 (7th Cir. 1971), cert. denied, 405 U.S. 964, 92 S.Ct. 1168, 31 L.Ed.2d 240 (1972); United States v. Clayton, *supra*, 450 F.2d at 19–20; United States v. Adams, *supra*; United States v. Weber, 437 F.2d 327, 335–40 (3d Cir. 1970), cert. denied, 402 U.S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971); cf. Childs v. Cardwell, 452 F.2d 541 (6th Cir. 1971), cert. denied, 407 U.S. 912 (1972); United States v. Glasser, 443 F.2d 994, 998–99 (2d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971).

story not primarily to discredit the reliability of Gonzalez's alleged identification of Puco, but rather to contradict and discredit Ellin's version of the events of July 2.[12] Used in this manner, the prior testimony is submitted for the truth of its content and is thus hearsay, which Judge Bauman could properly exclude, even though it may have had some very marginal probative value on the credibility of Gonzalez.

■ Apparently in anticipation of this conclusion, appellant also cited to the court below the prior recorded testimony exception to the hearsay rule. See C. McCormick, Handbook of the Law of Evidence ch. 25 (2d ed. 1972). However, this exception has traditionally been predicated upon the unavailability of the witness. See, e. g., id. § 255, at 617; Proposed Rules of Evidence, 51 F. R.D. 315, 440 (Advisory Committee's Note to Rule 804). Here the prosecution declared in open court its willingness to produce Gonzalez, but defense counsel declined. That Puco's attorney did not wish to expose such a witness to possibly damaging cross-examination does not justify introduction of Gonzalez's prior testimony under this exception to the hearsay rule.

Puco's final argument goes to the sufficiency of the evidence against him. We have already indicated that there was ample evidence for a jury to convict.

Judgment affirmed. We wish to compliment appellant's assigned counsel, Jay Goldberg, for his excellent briefs and argument.

## ON PETITION FOR REHEARING

FEINBERG, Circuit Judge:

The United States has petitioned for a rehearing by the panel, and, in view of the statements contained in petitioner's brief, it seems appropriate to comment briefly on them. The United States claims that the panel decision has unveiled

a new test which, as a pre-condition to admitting a declaration of a co-conspirator, requires not only the usual findings that the declaration is in furtherance of a conspiracy of which the defendant was then a member, but the additional findings that the declaration is "reliable" and that it is not "crucial" to the Government's case or "devastating" to the defense.

In addition, the United States claims that the "new test" is unsupported by Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), and that that decision, if anything, stands for the proposition that the traditional co-conspirator rule in the federal courts should remain untouched.

---

12. Thus, appellant wanted to introduce, inter alia, the following testimony of Gonzalez from the first trial:

*Gonzalez—direct*

Q. But, sir, you were sitting in the car with Agent Ellin, were you not?
A. Yes.
Q. Around 8:00 o'clock?
A. Yes.
Q. Before you came out of the car to go into 1382 White Plains Road, sir?
A. Yes.
Q. Is that correct?
A. Yes.
Q. Now, according to the testimony of Agent Ellin, you said, when the man came by, "That's my man," or "That's the man," or words to that effect?
A. No.
Q. Did you see Mr. Puco around there at that point?

A. I didn't see Mr. Puco at all.

*Gonzalez—cross*

Q. I see. Now, you were asked before, and I wish to ask you here, you drove up to 1380 White Plains Road, is that correct, sir?
A. I didn't drive.
Q. You mean the other, the agent drove, right?
A. Yes.
Q. And at that time, when you got there, did you at that time tell the agent that this was where your connection was?
A. No, I didn't.
Q. What did you tell the agent at that time?
A. I told him that they have told me that the package was to be picked up at 8:00 o'clock on that hallway, and that's all I said to him.

We believe that the Government reads too little into *Dutton* and too much into the panel decision in this case. While the Court did state in *Dutton* that "we do not question the validity of the co-conspirator exception applied in the federal courts," id. at 80, 91 S.Ct. at 215, it did so only to make clear what the issue was before it. The analysis in *Dutton,* as indicated by the panel opinion in this case, requires another look at the traditional co-conspirator rule in the federal courts.[1] The amicus brief filed by the Solicitor General of the United States in *Dutton* itself went into that question extensively. At least four circuit courts that have encountered the question since *Dutton* was decided have felt compelled to consider whether the Court's decision in *Dutton* affected the traditional co-conspirator rule, see the authorities collected in footnote 11 of the panel opinion, and two of them have gone through the same analysis as the panel opinion in this case. United States v. Adams, 446 F.2d 681, 682–84 (9th Cir.), cert. denied, 404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 257 (1971); United States v. Weber, 437 F.2d 327, 335–40 (3d Cir. 1970), cert. denied, 402 U.S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971). Therefore, we adhere to the position that ignoring the implications of *Dutton* is unwarranted and unwise.

■ The United States claims that as a result of the panel decision application of the co-conspirator rule in the district courts in this circuit will be unworkable. The Government suggests that from now on, because of the panel opinion, before a district judge decides that the declaration of a co-conspirator may be admitted, the judge must determine not only that the declaration is "reliable" but also that it is neither "crucial" to the Government's case nor "devastating" to the defense. The panel opinion made no such holding. In referring to the latter two criteria, we were acting out of caution—perhaps with an excess of that quality—to satisfy ourselves that the declarations of Puco's co-conspirator, Gonzalez, were properly admitted regardless of how broadly *Dutton* might be construed. We did not hold that *Dutton* had to be so expansively construed, and we do not do so now. Specifically, we did not and do not hold that a trial judge must find, before admitting a co-conspirator's declaration, that it is not "crucial" to the Government's case or "devastating" to the defense.

■ For future applications of *Dutton* to similar situations, we suggest that when a co-conspirator's out-of-court statement is sought to be offered without producing him, the trial judge must determine whether, in the circumstances of the case, that statement bears sufficient indicia of reliability to assure the trier of fact an adequate basis for evaluating the truth of the declaration in the absence of any cross-examination. That this is not an insuperable problem is indicated by the decisions cited above. Thus, in United States v. Weber, supra, Judge Adams pointed out that the co-conspirator's declarations in that case presented "the traditional hallmarks of reliability because they were uttered spontaneously" and were against his penal interest when made. 437 F.2d at 340; cf. United States v. Glasser, 443 F.2d 994, 999 (2d Cir. 1971). In most cases the determination that a declaration is in furtherance of the conspiracy—a determination that the trial judge now must make in every case for admissibility[2]—will decide whether sufficient indicia of reliability were present. While

---

1. Justice Stewart's opinion in *Dutton* makes clear that the fact that an out-of-court declaration comes within a traditional hearsay exception does not in itself assure the *constitutionality* of its admission into evidence. See 400 U.S. at 81–82, 91 S.Ct. 210. Decisions not dealing with the confrontation question are not controlling on this issue.

2. Along with the determination that there is sufficient other evidence to establish that the defendant against whom the declaration is offered was a member of the conspiracy when the declaration was made.

there may be exceptions, we do not think that they will be frequent.

Finally, we note that Puco's counsel apparently intends to petition the Supreme Court for certiorari.[3] If the Government desires a further clarification of the implications of *Dutton* for the co-conspirator rule, it can choose to support Puco's petition in order to obtain guidance from the most reliable source for interpretation of *Dutton*.

Petition for rehearing denied.

LUMBARD, Circuit Judge (dissenting):

I dissent.

The panel should grant the government's petition for rehearing to make clear that we adhere to the well established law of this Circuit concerning the admissibility of statements made by co-conspirators in furtherance of the conspiracy. Until now the generally accepted rule, not only in the Second Circuit but elsewhere, has been that where the judge is satisfied by independent evidence that the defendant was a party to a conspiracy, what another member said during the course of the conspiracy in order to carry it out is admissible against him. This time-honored rule is sound, sensible, and workable, and there is nothing in Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), or in policy which should cause us to abandon or qualify it now.

The testimony at issue here concerned what Gonzalez said to Agent Ellin when they saw Puco emerge from his TV repair shop. Ellin had previously arranged with Gonzalez to purchase cocaine which Gonzalez was to secure through his contact, "Al." For this purpose Ellin met Gonzalez and they drove to White Plains Road near Wood Avenue. Gonzalez pointed out the building where the delivery would be made at 8 o'clock. He had told Ellin that his connection owned a store in the area and used a nearby building for deliveries. At 8:00 P.M.

Ellin and Gonzalez saw Puco leave his TV repair shop carrying a bag. Ellin testified that at this point Gonzalez said to him: "There's my man now, the individual with the bag. He carries the merchandise in the bag." Puco then entered the building which Gonzalez had earlier pointed out. Gonzalez followed Puco into the building and came out almost immediately thereafter with a brown paper bag which contained one-half kilo of cocaine.

What Gonzalez said to Ellin about Puco was the statement of a co-conspirator made during the course of the conspiracy and in furtherance of it. As such it was admissible under the traditional co-conspirator hearsay exception which has been the law of this Circuit from time immemorial. Out of a host of cases, some before and some after Dutton v. Evans, supra, it suffices to cite United States v. Renda, 56 F.2d 601 (2d Cir. 1932); United States v. Geaney, 417 F.2d 1116 (2d Cir. 1969), cert. denied, sub nom. Lynch v. United States, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970); and United States v. Projansky, 465 F.2d 123 (2d Cir. 1972). Nothing in the plurality opinion of Mr. Justice Stewart in Dutton v. Evans, supra, undermined this long standing doctrine. The statement at issue in *Dutton* was not made during the course of the conspiracy but after the conspiracy was at an end, while one of the conspirators was in prison. This evidence would not have been admissible in a federal prosecution, but was permitted in a Georgia state court murder trial under a Georgia rule which allowed proof of statements made during the concealment phase of the conspiracy.

Mr. Justice Stewart made it unmistakably clear that the Court was dealing only with the situation presented in the Georgia trial. Thus at 400 U.S. page 80, 91 S.Ct. page 215, he stated:

"Appellee does not challenge and we do not question the validity of the

3. Appellant filed a motion, which was granted, to stay the issuance of the mandate pending the filing of a petition for certiorari.

coconspirator exception applied in the federal courts"          .

and he went on, at page 81, 91 S.Ct. at page 215 to define that exception as being one "that allows evidence of an out-of-court statement of one conspirator to be admitted against his fellow conspirators . . . if the statement was made in the course of and in furtherance of the conspiracy, and not during a subsequent period when the conspirators were engaged in nothing more than the concealment of the criminal enterprise." If the Court had meant to upset a doctrine that had prevailed in the federal courts for years with specific Supreme Court approval, e. g., Wong Sun v. United States, 371 U.S. 471, 490–91, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), it would not have left the matter to inference.

Despite the fact that the statement admitted against *Evans* did not fall within the well-recognized federal hearsay exception, the Court proceeded to analyze the Georgia rule in the context of the Sixth Amendment. Finding that the statement was not "crucial" or "devastating" and that there were sufficient "indicia of reliability," the Court concluded that the use of the evidence did not violate the Sixth Amendment and that it was therefore admissible. Thus, nothing in Dutton v. Evans, supra, cast doubt on the settled federal rule.

I see no reason for casting doubt upon the rule regarding the admission of coconspirator's statements. Before the declaration of a co-conspirator can be admitted, the judge must be satisfied "by a fair preponderance of the evidence independent of the hearsay utterances," see United States v. Geaney, supra, 417 F.2d at 1120, that the conspiracy existed and that the defendant was a member; and the statement itself must have been made in the course of the conspiracy and in furtherance of it. These requirements protect against the use of unreliable evidence, since the circumstances in which the statement is made— prior to detection and for the purpose of implementing the illegal scheme of which the defendant has been shown to be a part—tend to assure the reliability of the declarant and the accuracy of the statement. To the contrary, the statements received by the Georgia court in *Dutton* were made after the conspiracy had ended and were therefore subject to a host of reliability problems, including the possibility of improper motive or bias on the part of the declarant.

As regards statements within the traditional co-conspirator rule, it is of no moment in determining admissibility that these may be "crucial" or "devastating." Prejudice and relevance are inseparable in such cases, and if the statement is made during the course and in furtherance of the conspiracy, its obvious relevance must carry the day.

Whenever a criminal offense has been carried out by more than one person, and this is charged in a large percentage of federal criminal prosecutions, statements made by those who are the leaders, or by their confederates, in an effort to carry it out, are necessarily the heart of the offense. When taken together with the other evidence in the case, these statements, without any further proof, necessarily constitute reliable evidence of the kind which judge and jury are well equipped to evaluate. There is no logical reason to impede unnecessarily the use of this evidence as the panel opinion seeks to do.

It may be that panels of the Third and Ninth Circuits have regarded *Dutton* as a justification for changing the law in their respective circuits, see United States v. Weber, 437 F.2d 327, 335–40 (3rd Cir. 1970) cert. denied 402 U.S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971) and United States v. Adams, 446 F.2d 681 (9th Cir.), cert. denied, 404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 257 (1971), although in both cases, as here, the decision was in the government's favor and it was thus precluded from seeking certiorari. But a contrary result was reached by the First Circuit in United States v. Clayton, 450 F.2d 16 (1st Cir. 1971), where the defendant's petition for certiorari was denied, 405 U.S. 975, 92 S.Ct. 1200, 31 L.Ed.2d 250 (1972). I think my

colleagues are unjustified in unsettling the law of this Circuit without positive en banc approval of a majority of the active judges of the Circuit. The fact that only Chief Judge Friendly and Judges Hays and Timbers voted to en banc this case by no means implies that a majority of the active judges approve the panel opinion; I know from experience how difficult it is to persuade a majority of the active judges of a busy court to agree to en banc consideration where they believe the panel has reached the right result simply because they disagree with the opinion. In my view the panel committed serious error in an opinion, which should now be corrected.

I note that the panel has since filed a supplemental opinion on petition for rehearing. Although the panel has retreated somewhat from its original position, it has not gone nearly far enough. While the deletion of the "crucial" or "devastating" test is most welcome—although hard to understand if *Dutton* were really applicable—the panel still takes the position that the district judge must determine if a declaration by one of the co-conspirators in furtherance of the conspiracy sought to be admitted against a defendant presents "sufficient indica of reliability"—without offering any guidance as to what indicia will suffice. The supplemental opinion states that the determination that a declaration is in furtherance of the conspiracy will generally supply the needed "indicia of reliability." However, since the majority would give the defendant a chance to question this, it seems clear that, as a practical matter, the necessity of ascertaining whether statements made by co-conspirators during the course of the conspiracy are "reliable" will needlessly delay the trial of many federal cases. If trial judges should follow the lead of the dicta of the panel in this matter—and I hope they will not—they must either hold a pre-trial hearing, or, more likely suspend the taking of evidence before

the jury in order to go into this collateral question.[1] It now takes at least twice as long to try the average criminal case as it did ten years ago due in large part to the fact that before or during trial, hearings may now be required to determine the legality and admissibility of a search and seizure, a confession, or an identification. To this list my panel colleagues now would add a further test for statements by co-conspirators. Rather than further complicating and lengthening criminal conspiracy trials in this manner, I submit there is every reason for keeping the trial procedures as simple as possible, and for adhering to long accepted principles unless and until the Supreme Court should clearly instruct otherwise.

For these reasons, I would grant the government's motion for rehearing. I would strike from the panel opinion the seven pages of discussion under the section marked "II," pages 1102 to 1105 and substitute in its place the following:

"The objection to Ellin's testimony regarding what Gonzalez said to him about Puco when they saw Puco emerge from his TV repair shop carrying a bag and then enter the building next door is entirely without merit. Gonzalez's statement was the statement of a conspirator made in the course of the conspiracy to further the success of the conspiracy. Dutton v. Evans, 400 U.S. 74 [91 S.Ct. 210, 27 L.Ed.2d 213] is not in point. That case did not involve a statement made in the course of the conspiracy and in furtherance of it. In *Dutton* the Georgia state court had admitted a statement made by a co-conspirator after he had been committed to prison and arraigned on a charge of committing the same murders with which the defendant was charged. Thus the need for showing additional characteritics of reliability which Mr. Justice Stewart's opinion considered needed to

---

1. If the judge should rule erroneously against the government on this issue, he may well produce an unjustified acquittal, from which the prosecution has no recourse.

save the conviction in that case are not required here."

## ORDER DENYING REHEARING AND REHEARING EN BANC.

A petition for a rehearing containing a suggestion that the action be reheard en banc having been filed herein by counsel for the appellee, a poll of the judges in regular active service having been taken at the request of such a judge, and there being no majority in favor thereof,

Upon consideration thereof, it is

Ordered that said petition be and it hereby is denied.

Chief Judge FRIENDLY dissents in an opinion in which Circuit Judge HAYS and TIMBERS concur.

Circuit Judge MANSFIELD also dissents.

FRIENDLY, Chief Judge (dissenting):

FRIENDLY, Chief Judge, with whom HAYS and TIMBERS, Circuit Judges, join, dissenting from the denial of reconsideration en banc:

Like former Chief Judge Lumbard, I find it impossible to understand how two members of a panel can modify a rule of evidence applied by this Circuit in scores of decisions, approved by all the commentators, see, e.g., 4 Wigmore, Evidence § 1079 (Chadbourn Rev. 1972); McCormick, Evidence § 267, at 645–46 (Cleary ed. 1972); ALI, Model Code of Evidence, Rule 508(b); Commissioners' Uniform Rules of Evidence 63(9)(b); Proposed Federal Rules of Evidence, Rule 801(d)(2), recognized by the Supreme Court in cases as old as United States v. Gooding, 12 Wheat. (25 U.S.) 460, 469–470, 6 L.Ed. 693 (1827), and as recent as Wong Sun v. United States, 371 U.S. 471, 490, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and expressly preserved by the very decision, Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), now claimed to have qualified it.

The expression by the panel majority, unreviewable at the instance of the government since the decision was in its favor, is bound to create chaos in the administration of criminal justice in this circuit. Some judges may decide to disregard it. Others will attempt to apply it, although I am at a loss to know how they can since the panel supplies no guidelines as to what additional "indicia of reliability" will suffice. In some cases where a judge who regards himself as bound by the panel's expression finds insufficient indicia, exclusion will result in an acquittal, unjustified under the long-standing rule of law, from which the government will be unable to appeal. In others, where the declaration has been admitted and the defendant convicted, panels of this court will be obliged to face the question a majority of the active judges seek to avoid today. There will be many months of uncertainty before the law in this circuit can be put back where the Supreme Court meant to leave it, as it ultimately will be either by this court or by higher authority. I cannot think of a case more clearly demanding en banc consideration.